Good morning, Mr. Scott. Good morning. Good morning, Honors. Good morning, Counsel. May it please the Court. My name is Andrew Smith. I work for OSAD, and I represent LaTosha Williams, the defendant in this case. The application of the obstruction statute has gone too far, and this case is a prime example. LaTosha Williams was charged with obstructing a police officer when she stood in her doorway and told a police officer that he needed to present a warrant before entering her home. What if she was wrong? What if she was wrong? Are you asking if there was actually an emergency situation? Yes. What if she was wrong that he had to have a warrant? And that there was an emergency? Well, that may be the issue, So that's not the facts here. There was no one screaming behind her. There would be no way of her knowing there was an emergency, first of all. So he never explained why he's there. So how would she know there's an emergency? If there was an emergency, then I would say she would still have to have some awareness that the emergency is occurring, or she's violating statute. She's just trying to protect her home from a warrantless entry. But that's what a trial is for. That's not on the porch. You're not going in there. Was she on the porch when somebody came out of the house saying someone has a gun? I don't know. It's not clear where she was. Did the officer hear that? Did the officer hear the person yell that there's a gun? Yes. We don't know where she is. We don't know where Brandon Richardson is, the man who yelled there's a gun. We don't know where he is. We know that he yelled it sometime after running out of the house. We don't know where the officer is. I mean, I guess he's across the street. So all of these uncertainties as to we don't know where. Wasn't that testimony at trial? And didn't the trial court, the trier of fact, the jury, the trier of fact, make a credibility determination as to who was yelling when, where everyone was at that time? What credibility? About whom? About the police officer's credibility, your client's credibility, the witnesses who came out and said they saw this or they heard that? Wouldn't the trial court make that determination? Yeah, the trial court would make a determination on credibility, but you have to also look at what the evidence was. So I guess we're talking about the second issue here. Does she know that there's an emergency? And I guess we're talking about whether him running out of the house and yelling there is a gun would let her, we don't even know where she is. She could be in the house. We don't even know. It somehow let her know that there's an emergency. I mean, I think that is pretty, I don't see how that can prove beyond a reasonable doubt that she's aware there's an emergency, especially when there's no one in the house screaming, threatening, there's no gun in the house. Well, how can the officer, the officer may not be able to hear anything at the point he's on the porch, but he is sent there for a purpose. He is dispatched there for a purpose. Right. Are you saying that an investigation pursuant to a dispatch is not an authorized act? I'm saying that you may investigate. All right. I don't dispute that he had some authorization to see what was going on. Someone ran out of the house saying there's a gun. That alone is not a crime. He can go see if a crime is occurring. Once he gets to the house, the problem is he finds out there's the more information he learns, the more it looks like there's not a crime. What information did he have after someone has a gun and now there is nobody yelling? There was, he said, as he walked up. But he still hears something slamming like cabinets, I think, was his testimony. Yes. So slamming cabinets has never been held to be an emergency situation into a house. Well, but we don't know why the cabinets are being slammed, do we? Maybe somebody's head Well, that would go beyond what any court has ever held to be an emergency. What the courts have held as an emergency is someone throwing something at someone where they actually saw a person throwing furniture at someone. They saw blood outside. Supreme Court case, Michigan v. Fisher. There's Brigham City v. Stewart where the police saw someone punched in the face. There is people v. Lomax, a case from this Illinois appellate court where they actually heard gunshots and 9-1-1 calls. We don't even have a 9-1-1 call here. Well, we do. But we don't know it's a 9-1-1 call. We don't know where this is coming from. Someone called the police. Someone called the police. We don't know if it's anonymous, Tim. We don't know. We don't know. Okay, so someone calls the police from a residence saying that at this residence someone has a gun. We do not know. What they had was subject with a gun. That's all we know. He was dispatched to the residence and the dispatch said subject with a gun. So we don't even know. I mean, it's a stretch even to say that the gun was in the house. All we know is someone ran out of the house saying there's a gun so maybe we can infer there might be a gun in the house. But that's still... Don't we look at the entirety of the circumstances, what the officer believed, what the entirety of the circumstances were at that time? Sure. I mean, you look at the entirety of the circumstances and I think one of the things you can look at is what the officer's actual testimony was. He said when I first approached the house, I tried to get people out of the house and that didn't work. So at that point, I wanted to at least get up and talk to the two females that I saw on the porch and try to see if anybody was injured and just kind of see what was going on. I didn't want the officer to run and set up a perimeter. That doesn't sound like an emergency to me. He seems to be trying to set up a perimeter. He doesn't seem to be intending to enter the house. Didn't the officer also say someone called 911 because there was a gun? He went there, he heard yelling and pounding. He saw a man running out yelling someone has a gun. No one called, we don't know if anyone called 911. Well, somebody called the police. Call it 911, call it, call the police. They called the police and that's how he got out. Well, I bring that up because an anonymous tip in JLD Florida is not that someone has a gun is not even enough to do a Terry stop. We're here talking about entering a house. So knowing what the actual call was is very important and not knowing whether it's a 911 or it's anonymous has huge consequences. Okay, so let's look at this the way the reasonable police officer at whatever time this was in the evening approaching that location with a call that there's a person with a gun at this location. Right. Okay. And so then he hears, there's a big commotion going on in the house to the point where he hears banging and yelling going on in the house. Someone comes running out of the house yelling they have a gun or something. Yeah. Okay. So when the officer goes on the porch, what you're saying is that he should then see that there's two ladies there. Maybe ask him to leave. He should just turn around, get back in his squad and drive away. I'm saying that he has a duty to go up there, see what's going on. Once he gets there, first of all, there's a gun in the house is not a crime. All right. So the fact that there's a gun in the house does not mean it's protected by the constitution. But again, he knows there's people still in the house, correct? Because I mean, he hears banging and things going on in the house. Right. So you know that there's someone in the house with a gun and there's still other people in the house and someone is, you know, if someone had a gun and they were showing me their collector's item, I don't think somebody would come running out of the house going, he's got a gun, he's got a gun. And you just don't think that. Right. So a police officer going onto that scene would think somebody is concerned enough to call the police. Someone is concerned enough to run out of the house knowing he has a gun. You don't think maybe a police officer thinks someone's being threatened in there with a gun or there's something going on that needs their attention? I'm saying that would go beyond anything that this court has held, the Supreme Court has held. Just making that jump that because someone ran out and yelled, there is someone, something about a gun, which is not a sure thing. So he should turn around and get escorted? No, what he should do is what he should go up, ask, is there, is someone threatened here? Is everyone okay? When you went up there, the noise went away. All right. They said, please leave. He testified that the noise was ongoing. He didn't say that the noise totally went away. He said that once he reached the house, the noise quieted down. Yes, that's what he said. But he heard, he still heard people in the If there was a threat, there would be someone yelling. I mean, the idea that our client is trying to protect someone inside the house randomly shooting, it's completely unreasonable. I just think of the officer, what would happen if one of the ladies said, leave my house, unless you have a warrant. He got back in a squad car and drove away. And then God forbid somebody got shot in that house. What do you think happens then? Because several years ago, you're probably too young to remember this, but in Harvey, there was a situation where there was a young lady, a teenager being raped in a house. And there were a bunch of officers standing outside while the rape was happening. And all those officers got fired because they didn't go into that house on that emergency situation. Well, I don't know what were the facts in that case. I mean, you're talking about something, somebody has a gun, he goes up and the information, the more information he learns, the more he learns there's not an emergency. At some point, the investigation has to stop if you learn there is not an emergency. Counsel, what did he learn other than get off my porch? She, according to him, is screaming at her or him, you don't have a warrant, get off my porch. What does he learn? He learns first, his other officer, Andrew Houghton, detains the Brandon Richland who runs out of the house. And he says, there's someone, he doesn't say he was threatened. You'd think if he was detained and questioned, he'd say, I was threatened. He didn't say that. He says, someone has a gun in the house. So we've learned now more on non-emergency situations. Then he goes up to the house, the noise quiets down. And they say, you need a warrant to come in their house. He doesn't hear any injuries, doesn't see any injuries, doesn't see any destruction. How do you hear an injury? He doesn't see any injuries. How does he see in? Because according to him, she's standing in the doorway. At one point, she moves out of the way. He then looks into the house. He doesn't run in if there's an emergency, he would run in, right? Not if someone has a gun. You might start shooting. I'd run in behind you. You could go first and I'll run in after you. Okay. Well, he looks in and there is no, there's just people milling around. So I mean. Does he see the whole house from that front door? He's not able to see the whole house, but you have to have an emergency to enter. The more information you're running, there's no emergency. What is your basis for entering? Do you believe then at that point, you cited the Jones case, but do you think at that point that this officer's investigation was complete? I think, yes. I mean, and it parallels U.S. v. Jones. And that case placed a duty on officers to investigate domestic violence. So when they showed up, they said they didn't see any injuries. They said there's nothing wrong here. And then the officer tried to grab the guy and arrest him and they said that that was unauthorized. The case also said that was the only potential victim present on the scene, correct? So then that argument is that because it's a house, there's less protection. Because we can't see throughout the house and because this is occurring inside the house, that you have less protections if this occurred on the street where you could see people. I mean, that just seems to be that we're saying, oh, we can't see anyone in the house. The issue is potential victims. I mean, the issue is when I go on the porch and I see it's a domestic situation, a man and a woman, the woman is the potential victim. I see she's fine. She's got no signs of injury. She says, I'm fine. Jones says, okay, you're done. Have a nice day and leave. Right. The argument here is that there's a person with a gun in the house. Other people are still in the house. Yeah. It's because you still hear noise from the house. So you don't know if someone's being threatened, even the police are. Right. So you're saying that because everyone is outside of U.S. v. Jones, that you know no one's injured and that because people are inside a house, that you have less protection, that because I can't see inside everyone in the house, I have more of a duty, more of a right to enter someone's house. I mean, the house is more protected than outside. Well, you're forgetting the fact of the gun. I mean, the issue is the gun, not the house. The issue is whether there's someone threatening individuals in the house with a gun. Well, we don't have any evidence of threat. I mean, so we're just speculating. We keep talking. Why are we assuming there's a threat when we have talked to the guy who said there's a gun and he didn't say there was a threat? Why do we keep assuming there's a threat here? Okay, you're in a movie theater and somebody jumps up and said, he has a gun. What are you going to do? Are you going to sit there and continue watching the movie? Well, it's not about what I'm going to do. It's about what the rights are of the officer. So, and that would parallel J.L. v. Florida. And let's ignore the fact that a movie theater probably can't carry a gun. So let's say we're outside, all right? You're too practical. Okay, let's say we're outside. And you don't have a right to carry a gun in a movie theater, so yeah, you can search there. But let's say we're outside and someone says, they have a gun. Someone has a gun. He has a gun. That and U.S. v. Reinhart, the Illinois court said, you can't even do a Terry stop. I guess my point that I'm trying to get to you is not only does your client know whether or not there is a threat or does she know that she is obstructing justice or obstructing, but what is the knowledge of the police officer at that time? And the knowledge of the police officer, as Justice Burke pointed out, is that he went there being told somebody has a gun. He gets there and some guy comes running out of the house and said, there's a gun. Right. So I guess at that point, I'm going to go back to the same question. Is his investigation complete merely because your client tells him, time to go get off my porch? No. As I said before, the fact that there's no injuries, no damage, no one yelling for help, that would lead you to conclude, I don't have the right to, this is not an emergency, an immediate need to protect life. And I also want, we keep focusing on the acts of the officer. Was he reasonable? The officer's not being charged in this case. It's Latasha Williams. She's being charged with standing in her doorway and asking for a warrant. Before you go, I'm going to give you a few more minutes to talk about your second issue, which is the jury instruction, the plain air, and not closing. Yeah. Do you want to address those real quick? Yeah. I was not addressing that. I was going to stay on my brief, but briefly I can say that this is not an, I think partly why she was found guilty in this case, because the jury doesn't understand actual circumstances. And second, the prosecutor said, as long as you're just in the way of an officer when he's trying to enter your house, you're guilty. And that's not the fact. There has to be some knowing obstruction here. And what does she, she doesn't know why he's even there. How can she be knowingly obstructing him? It would be innocent conduct. If someone comes up to you and says, let me in your house, I want to see your TV. You wouldn't say that you're knowingly obstructing them. You're just saying, raising your right. Well, at R298, I mean, the prosecutor said, now this knowing obstruction must be of the performance by officer Arnold of an unauthorized act within his official capacity. That seems to indicate that he's telling the jury, now this must be a knowing obstruction of the performance of an authorized act. Did he not say that? He also said that all that matters is that you didn't trip and were there. That as long as you didn't trip and you were just standing there, knowing that you were standing there. Well, he didn't say all that you have to prove is that she didn't trip. I think he said that in this case, it wasn't an accident that she was there. Right. But you're taking that to the next level that he's basically just basically saying, we don't have to prove knowledge. Whereas I have a couple of different instances where he seems to show that he has to prove, he can tell the jury he has to prove knowledge. Again, at R298 he says, the defendant stood in the doorway, not allowing the police to investigate this complaint, which would indicate that, you know, knowing that she's, she's holding them back from an official act. He may have said that, but I think that the fact that he also said that it's not an accident that she's there, it's telling the jury that all that really matters here is that she just stood there. But again, you can't cherry pick one thing out of an argument and disregard everything else that the prosecutor said, correct? Well, I think if they're telling two different things and the one's a very low burden, I mean, and the jury's hearing that very low burden, that would be a problem. So one misstatement of the law would result in a reversal? Well, the court's held that a misstatement where you're misstating the burden of what you have to prove at trial is grounds for reversal. Even where at other points you, you stated the proper burden. You have a case that says that? I don't know about a case that says that. I mean, I imagine that it wouldn't make much of a difference if you're misstating the burden at one point and then saying, I mean, it sounds to me that that, her explanation is a clarification of what you quoted, that let me explain what I mean by that. If she wasn't accidentally there. How long do you think this whole thing took? So there's not, that's not clear. It's not clear, but we know that by the time Houghton, the officer who took Mr. Richardson and detained him and put him in the car, by the time he finished questioning him and walked out towards the house, Officer Arnold was at that time arresting my client. So however long it takes you to question someone, I mean, there's just so many. Let's go back. He never said, has anybody heard? He said, please move out of my way. And she screamed. He didn't get to ask any questions, did he? The first thing he said was get out of my way. Right. And where does it say in the instructions or anywhere if he is investigating a gun complaint that he has to say, now, excuse me, I'm here to see how you're doing. Yeah. Where does it say that? Oh, I mean, obviously that doesn't say that. Have you ever heard of like community wellness checks and things of that nature? If the officer came to you belligerently demanding his entrance into your home, I mean, come on. You're putting all the burden on my client that a guy, an officer is coming belligerently to you and you have to submit. I'm putting the onus on the police officer to do an investigation, which in my mind requires looking, checking and what he knows. He doesn't have to have probable cause at that point. He has to have information that requires him to investigate, look, question and decide. Yeah. And he never got past the porch. Well, he got into the porch. Well, all right. It's in a closed porch. He didn't get, there's nothing happening on the porch. That's pretty obvious. Yeah. But that's not what Mr. Richardson said as he ran out of the house. He ran out of the house, not just off the porch. What point would the information that he's learning be telling him that there's not an emergency? Well, he doesn't get the information from home until he's putting her under arrest. So there is a period of time where he doesn't know that there was no threat. But there wasn't any threat. But that's, we know that later. We didn't know it at the time. Well, Dawn talks about what happens when there's a possibility of criminal conduct. All right. And it says that just the fair possibility that we have some criminal conduct going on is not enough to enter a house. I mean, we're talking about possible criminal, possible things. We have to have evidence. There was a threat, there was an injury. So you go beyond anything this is protected by the Second Amendment. What we learned was not a crime. Okay. Thank you. You'll have your opportunity in rebuttal, Mr. King. Ms. Diaz. Good morning, Your Honors. Counsel, may you please support Aileen Diaz on behalf of the people. Would Your Honors like me to start with the closing argument? I can address that. Okay. Counsel's point, which I did not adequately address in my brief as to the, well, first of all, counsel's argument as to the second comment, the argument that he makes on page 22 of his brief, the comment that the prosecution in its closing told the jury that the officer did not have to tell the defendant why the officer was there. That's not a misstatement of law. And counsel seems to concede that or acknowledge that in his reply brief. As far as the knowingly resisted or obstructed, counsel cites to Buckley to support the proposition or the argument that that is a misstatement of the law and that the prosecution in following the statement knowingly resisted or obstructed by facts that were in evidence that the prosecution was trying to lessen the burden. We disagree. So while we did not address that, as far as that particular comment, we maintain our position that that was not plain error. Do you agree that a person voluntarily choosing not to move is not enough to prove obstructing? Yes. I mean, there has to be knowledge there, correct? I agree. Did the comments that counsel spoke of, you know, this wasn't an accident, defendant didn't trip or fall, you know, she chose not to move, did that diminish the burden of proof regarding the element of knowledge? We do not believe that it did, but we also submit that the record, or I'm sorry, the closing arguments have to be taken as a whole. We have to look at the entire closing argument. And that alone did not materially impact the jury's decision. The evidence was not closely balanced. And if you look at, I mean, this is very different from Buckley. The prosecution did not misstate the law. I mean, that's the correct state of mind. And then it was followed by facts that were in evidence. I would agree that those facts included would not be sufficient to prove the knowing element. But if you look at the closing argument in its totality, then we would submit that nothing rises, that there was no error. And if there was error, nothing would rise to the level of plain error. I'm sorry, on the first issue, are we, or is your argument pyramiding inferences that was disallowed in Kotlinski, basically taking an inference and then building another inference upon that in order to show that this officer had reasonable grounds to be standing where he was? Absolutely. Absolutely not. Okay. So we understand counsel's concerns with the home, but the way defense would have us believe is that we should take these things in isolation. The gun in the home, as you pointed out, Justice Burke, I think, or as you alluded to, if somebody is polishing a firearm collection at home, I don't think that that's going to lead to a dispatch call or a dispatch. And we don't know whether the call was to 911, but it was to the police and there was a dispatch. So now we have a dispatch about a firearm in the house. When the officers approach, both officers who approached, the arresting officer and then the second officer who's coming from the westbound direction, they both heard Brandon Richardson yelling, someone has a gun. So now we have the dispatch call, and we have a dispatch about someone in this home with a gun. We have somebody yelling, running out of the house, yelling that someone has a gun. We don't know who has a gun, but somebody in that area has a gun. And all we need to prove that the police, to invoke the emergency aid exception, is that the police must have reasonable grounds to believe that there is an emergency and that the emergency is related to the area that they're investigating. The dispatch was to this residence, 611 St. Charles. Once they got there, they saw Brandon Richardson fleeing the area and yelling that someone had a gun. The arresting officer heard commotion inside the house or pounding, hostile yelling. During cross examination, I don't remember if it was direct or cross, but the officer was asked about the tone of the yelling coming from within the house, and he testified that it was hostile yelling. So there was pounding, there was hostile yelling, and the timeline isn't clear as to when this subsided. But we don't know why this subsided. This could be part of the emergency that he believes is taking place, because when he approaches the house, contrary to what defense or the defendant would have us believe, the officer didn't have an opportunity to engage in a conversation with defendant. Defendant was frantic. In an ideal situation, I believe that an officer would be able to engage in dialogue. If questions are asked, maybe it would be prudent to engage in dialogue. Here, there was no opportunity for that. He asked her several times to move. Well, he testified that the first thing he did was try to get people out of the porch. Once that didn't work, because the defendant kept yelling at him and she was frantic, he had to move. And in an ideal situation, that wouldn't be happening, but those are the circumstances of this case. And this is distinguishable from Jones, because the officer heard noise in the house. He knew there were other people in the house. If this is an emergency, the situation that led to the dispatch and the situation that he is observing, I mean, we can't look at this in hindsight. We have to look at what the officer knew when he made this arrest. What the officer knew was that there was a dispatch about a gun in this residence. There were additional people in the residence. There was somebody fleeing the scene. I don't know that somebody would be running out of a house screaming someone has a gun if all that's going on is somebody polishing a collection. I mean, I just don't see that happening. This all lends itself to a very strong argument that the officer reasonably believed that there was an emergency that needed to be taken care of at this home. And Jones, once the officers, or I believe it was one officer, it's not that, as the defendant would have us believe, that the outdoors are afforded more protection under the Fourth Amendment. We know that the keystone of the Fourth Amendment is to protect homes. We understand that this was in a home, whereas in Jones the altercation took place outside. However, the situation about which the dispatch was made in Jones was ostensibly resolved at one point. So at that point, the officer probably should have left. This is distinguishable. There are people inside this house. If this were a domestic violence situation, the officer would have a duty to continue to investigate here. We believe that he not only had a right, but we would go so far as to say that he had a duty to keep investigating. And defense makes much of this investigation and that the officer talked about setting up a perimeter. Setting up a perimeter during an emergency situation is not inconsistent with having an emergency situation. This is not a calm and deliberate investigation. How do you distinguish this case from Kotlinski? Okay, that's the DUI. Kotlinski, well, first of all, in that case, the defendant was not obstructing the police officers. As far as knowledge, his wife, I believe, was out of sight by the time the officers were conducting the fields. He didn't know what was going on at that point. And once he was told to get back in the car, he got back in the car. I mean, but as far as knowledge, he didn't know once his wife had been out of sight what was going on. Here, this defendant, who is, as far as the record demonstrates, it's not clear, but as far as the record, there's strong support for finding that defendant was closer to this house. And if you look at the front porch, if you look at the front porch, if you hear Brandon Richardson yelling, defendant could hear Brandon Richardson yelling, especially if he was running out of the house where she was. I don't know if he ran out of the front porch. That's not clear in the record. I don't know where he ran from, but he ran off of that property. So she heard that. There's a reasonable inference. There's, we can't say that she was with the dispatch. We don't know where that came from. But there's noise in the house. There's hostile yelling. And the fact that she was frantic when the officers arrived, I think that cuts the other way. I think she's frantic saying, we're not going to let you in. We don't want you here. I mean, that could very well be an emergency situation. We don't know who's inside the house. We have a dispatch about a gun. We know there are people inside the house. And if she's telling the officers, I mean, at that point, the arresting officer didn't know that this was her home. There was no opportunity for dialogue. It wasn't a calm situation. And defendant disputes this, but we maintain that it was a chaotic scene. And the knowledge, I mean, absent testimony from the defendant saying that she had knowledge or testimony saying that she was there, or saying that she didn't have knowledge, which would be credibility determination, we have to infer the knowledge from circumstantial evidence. And we have that here. We have two officers who were, well, I don't know how close they were to the house, but they were not as close as she was. She was on the property. And if they could hear somebody yelling about a gun, she did know that there was a reason that the officers were there. There's hostile yelling in the house. There's banging. There's pounding. And there's somebody fleeing from the home yelling something about a gun. And she frantically behaves in a way that doesn't allow the officers to engage, or I'm sorry, Officer Arnold, to engage in any type of conversation with her. She knew. When the officer first walks on the porch and he asks her to move because she's blocking the doorway, because he wants to see her, he tells her to move a bunch of times. Finally, she does move and leaves the porch, correct? Yes. Then, ostensibly, he can see inside the house. Yes. And then when she comes back on the porch, she's arrested. Do the officers' actions somewhat belie the argument that there was an emergency? I mean, the officer's saying, move, I want to look inside. Then he gets a chance to look inside. Then when she finally leaves the porch, he doesn't go in the house. I mean... Well, we submit that that actually supports the emergency argument. The officer testified that he was only able to look into the home briefly, and she was still behaving erratically. He had a brief glimpse into the house. And as he said, because of the nature of the dispatch, he wasn't going to go in there until a safe perimeter had been set up. And a safe perimeter under these circumstances are not inconsistent with an aid situation, given the nature of this call. It's very fact-specific. As an officer, it's not unreasonable. He has to think about his own safety, too. He has to think about his own safety and the safety of the people in the house. He doesn't know if there's actually a gun in there. It's a chaotic scene. Yes, he gets a brief glimpse into the home, but it's not unreasonable for him to not have gone in. I'm sorry. I think that supports the fact that he actually believes that there was an emergency afoot. Does he ever pull his gun? Do we have information that he pulled his gun? We don't have any information. And certainly, our experience says if he has pulled a gun, somebody's going to tell us that, right? My experience would, yes, yes. But that's not in the record. Your Honor's have... All right. Well, thank you so much. And we ask you to affirm the judgment, Your Honor. Thank you. Thank you. Mr. Smith, come on up. Just the State keeps, I guess, acknowledging that he was trying to set the perimeter, and that's what his goal was. If he's trying to set the perimeter to the house, how is she impeding him from entering the house? She also... Well, isn't that a question of whether or not... One of the issues in a perimeter, and we'll assume the other word is a safe perimeter, is to try to remove anyone from the house who may be in danger. Was he able to do that? He said that he had no right to remove anybody from the house. He said that he had no right to force them to speak to him. Well, that's true. They don't have to talk to him. They don't have to tell a name. It's been decided a long time ago, and if they tell a false name, they better be careful. But he needs to... He said he wanted to make sure no one was in danger, and he wanted them out of the house. Maybe they won't leave, but at least he needs to know who's there, and that was his goal at that point. She's not being charged with blocking him from setting the perimeter. She's being charged with stopping him from going inside the house. She's being charged with stopping him from an authorized act. The authorized act is an investigation, and that's what she's saying. An investigation is not an authorized act, as decided by Hilgenberg. It does not give you the right. It's an act within his official capacity, isn't it? An undergoing investigation is not an authorized act. There has to be more. Hilgenberg decided that. Another thing, she said that my client was frantic when she got up there, and that that somehow made it seem like there was more of an emergency because she was raising her Fourth Amendment right. I mean, I just think that gets into dangerous territory here. We're saying that the raising of the Fourth Amendment... He's testifying that she was yelling. Did he say that when I approached, she said, excuse me, officer, do you have a warrant? I have a Fourth Amendment right. Is that what she said, or did she yell at him, get off of my property, let me see your warrant? That's not disallowed to yell at a police officer. You're saying all the burden on her, and when he has come into her house and told her to get out of the way... We have to figure out what he was doing and what his reasons for this were. She has a place to litigate a violation if it occurs, and that's in a courtroom. She does not have the right to litigate it on the steps while he is in his official capacity. You do have the right to litigate when they are not effectuating an arrest and they are making an unconstitutional entry. You have the right, as said by the city of Champaign-Piz Torres, to use reasonable force to stop someone from entering. Jones said that. Young said that. There's five or so cases that say you can use reasonable force when an unconstitutional entry is occurring. Here, she didn't even threaten to touch him. She didn't even touch him. She's standing. She doesn't know she's doing anything wrong. All she knows is that if an officer tries to enter my house without a warrant, I have to ask for a warrant. That's my right. That's all she knows. She's not a lawyer. She doesn't go through an accident circumstance and have this in her head. She knows I can raise my right, and that's what she was arrested for. And once she did, why didn't she follow his orders? Because if she knows that much, she also knows that she needs to follow the orders of a police officer. You don't have to follow the orders of a police officer if he's not effectuating an arrest and if he's trying to make an unconstitutional entry. Five people who were young said that. People who were swice said that. People who were Jones. You cited Kotlinski, and you heard Ms. Diaz tell us why Kotlinski doesn't apply any more. Aren't those facts much different than what we have here? I would say that they are different, but they're different because here we're dealing with a house. So here, like, he's getting out of the car, so the idea that he doesn't know that he's interfering, right? Here, she doesn't know that so much as she's interfering, she thinks she's rightfully raising her right. Oh, I see what you're saying. So you're saying that the knowing by her, if she doesn't know that she is interfering, feels that what she's doing is justified, it can't rise to an obstruction. Almost. If I could say hypothetically, if an officer comes to your house and says, I need to see your TV, let me in, and you raise your right, I wouldn't think that the law would say you're knowingly obstructing him. You've been told an unconstitutional reason for entering the house. So if she's raising what she perceives to be her right, she's raising that. She doesn't realize she's obstructing justice. So even if she's wrong, she still didn't have the specific intent to do so. Is that what you're saying? So you're saying if it later comes out that she was wrong in raising her right? Right. Okay, so the officer comes up and says, let me in your house, I want to see your TV, and you say, no, you can't come in my house, I have a 4th Amendment right, and then it goes to trial and it comes out there was a bomb in the house or something? Correct. I think that puts an incredible duty on a person. She's not been told why he's coming, she doesn't know that there's an emergency. I mean, I just don't see how the law can punish you for that. According to the state, if an officer comes up to your house and says, let me in, and you say, you cannot come to my house, you need a 4th Amendment right, you can be arrested and thrown into jail for a year, and then we're going to litigate that, whether he's got an authorized right. There's so many other options here. Or you could get a dispatch call as an officer that there's someone in the house with a gun, go to the house with a gun, and hear a bunch of screaming and yelling, and a man running out saying, there's a gun in the house. Aren't those facts a little different than somebody coming to your door and asking you to see your TV? Yeah, that's focusing on whether there's an emergency situation, which I think I've gone through, that just the fact there's a gun, that's not a crime. But we have to remember that my client's the one being charged with a crime here, and she has to have some awareness that she's doing something wrong. This is not a strict liability, this is not tort. It's not the officer being charged with a crime. And to say that going to court is some easy thing, going to court can bankrupt people, it can put you in jail, this is not a motion to suppress or anything, but it can cause serious problems. It's not easy just to go to court. There's so many other ways to deal with this, detain her briefly like they detained Ms. Richardson, go in if you think there's an emergency. But to charge her with a crime, I think is, we get into dangerous territory for that. Thank you.